IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |  |
|---|---|---|
| ANGELA JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-03-BE-1923-E |
| | ) | |
| PRODUCT ACTION INTERNATIONAL, L.L.C, | ) ) ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

This case is currently pending before the court on a motion for summary judgment (doc # 21) and supporting evidentiary submission (doc. # 23) filed by defendant Product Action International. Product Action provides sorting, inspection, rework, and containment services to manufacturers and suppliers in Canada and the United States.[1]  The plaintiff has submitted a brief objecting to the motion for summary judgment (doc. # 30) and supporting evidentiary submissions (doc. # 29). The court has jurisdiction of this case pursuant to 28 U.S.C. §1331.

Having reviewed the briefs and evidence submitted by both parties, the court concludes that the defendant's motion for summary judgment is due to be GRANTED in part and DENIED in part. Specifically, the motion for summary judgment is due to be DENIED on the plaintiff's claim that she was terminated in violation of 42 U.S.C. § 1981, and GRANTED on the plaintiff's 42 U.S.C. § 1981 retaliation claim.

---

[1]*See* Aff. Mark Urschel ¶ 5.

1

## I. FACTS[2]

Plaintiff Angela Jones, an African-American female, began working for the defendant as a quality inspector on March 11, 2002.[3] Quality inspectors are typically assigned to many different client locations[4] and work with a variety of field supervisors. Jones' immediate supervisors were field supervisor Chuck Livermore, project coordinator Brian Harris, and location manager Jeffrey Peake. During the time period at issue in this lawsuit, plaintiff was assigned to the Honda manufacturing plant in Lincoln, Alabama.

Count one of the complaint alleges that Jones' termination was the result of the racially differential application of Product Action's job abandonment policy. The defendant's employee handbook describes job abandonment "as leaving the job site, leaving the work incomplete, without first notifying a supervisor, manager or scheduler and obtaining permission to leave in advance. First offense will result in termination."[5] The strict application of this policy is based on the defendant's determination that leaving the assembly line without permission from a supervisor, even for a brief period of time, could result in a failure to locate and remove defective parts.

Jones' termination claim arises from the events of August 6, 2002. On that date, Jones was the only Product Action employee at the Honda plant assigned to the task of identifying tires with missing hub covers. Project coordinator Brian Harris asked plaintiff to be vigilant for "IPP" tags[6]

---

[2]Based on the through presentation of the facts contained in the parties' briefs, the court does not include a complete recitation of the facts in this Memorandum Opinion.

[3]*See* Aff. Mark Urschel ¶ 9.

[4]*Id.*, at ¶ 7.

[5]*See* Doc. # 23, *Ex.* 2.

[6]The parties' submissions do not provide the court with a clear definition of an IPP tag.

on the tires as they passed her work station. Harris also asked Jones to notify location supervisor Chuck Livermore when she saw the IPP tags. However, Harris did not provide plaintiff with a phone from which to contact Livermore. According to the plaintiff, Harris told her the presence of these IPP tags would signal the end of her job.[7] Jones estimates that she saw the IPP tags between 3:00 p.m. and 3:15 p.m. and admits that she left her work station fifteen minutes before the end of her shift to inform Livermore of the receipt of the IPP tags. Product Action terminated Jones because it considered Jones' departure a violation of the company's job abandonment policy. Human Resources Manager Mark Urschel, location manager Jeffrey Peake, and operations manager Frank Houck jointly decided to terminate Jones.[8] Jones contends that similarly-situated white female Quality Inspectors Jessica Whitehead and Kelly Brown were treated more favorably although they also violated the company's job abandonment policy.

Plaintiff also contends that the defendant's decision to apply its job abandonment policy in a racially discriminatory manner was in retaliation for her complaints to location manager Jeffrey Peake that her three-day suspension in July 2002 was discriminatory. Jones' suspension was allegedly based on an inappropriate comment to a fellow co-worker. Although Jones testified that

---

[7]The defendant disputes Jones' version of events. However, for the purposes of summary judgment, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-movant. *See Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

[8]According to the plaintiff's version of events, Mark Urschel, Jeffrey Peake, and Frank Houck jointly made the decision to terminate her. The defendant disputes the plaintiff's characterization and contends that Mark Urschel was the person vested with ultimate authority to terminate the plaintiff and, consequently, was the ultimate decision-maker. *See* doc. # 33, p. 5. However, these statements are disputed by the testimony of at least one of the defendant's own witnesses. For example, Frank Houck testified that "[Jeffrey Peake] called Marc Urschel, and *we collectively reached a decision . . .* and terminated her for that particular instance." *See* Dep. of Frank Houck, p. 20 (emphasis added). *See also*, Dep. of Frank Houck, p. 22.

she complained to Peake, she did not lodge any complaints of racial discrimination with Urschel or with any other Product Action employee.[9] Furthermore, no Product Action employee told Urschel[10] that Jones had previously complained of racial discrimination. Furthermore, nothing in Houck's deposition indicates that he was aware of Jones' 2002 suspension.[11]

Product Action vehemently denies any discrimination and contends that it is entitled to summary judgment on all of the plaintiff's claims. In response to the allegations of racially discriminatory discipline, the defendant argues that Jones cannot establish a prima facie case of disparate discipline because of her inability to identify similarly situated white comparators. Even assuming the existence of a prima facie case, Product Action argues that nothing in the record creates a genuine issue material fact that its asserted justification for Jones' termination (i.e., the violation of its job abandonment policy) is a pretext for racial discrimination.

In arguing for the dismissal of the plaintiff's retaliation claims, Product Action contends that Jones cannot establish a prima facie case because she cannot establish that her complaints to Peake are a statutorily protected expression or adduce evidence of a causal link between her termination and suspension. The defendant specifically argues that Urschel, who it describes as the ultimate decision-maker, was not aware of Jones' prior complaints of discrimination and consequently, could not, as a matter of law, have retaliated against her.

## II. STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure and allows a

---

[9] Pl's Dep., p. 58, 78-80.

[10] *See* Aff. Mark Urschel ¶ 12.

[11] *See* Houck Dep., p. 17-19.

trial court to decide cases when no genuine issues of material fact are present. Fed. R. Civ. P. 56. The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).

In responding to a properly-supported motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986) (citations omitted).

However, disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson*, 477 U.S. at 247-48 (1986). A factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 251-52.

Furthermore, when the court considers a motion for summary judgment, it must refrain from deciding any material factual issues. All evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). The court must avoid weighing conflicting evidence or making credibility determinations. Instead, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Where a reasonable fact finder may "draw more than one inference from the facts, then the court should refuse to grant summary judgment."

*Stewart v. Booker T. Washington Ins. Co.,* 232 F.3d 844, 848 (11th Cir. 2000).

### III. DISCUSSION

Product Action urges the court to enter summary judgment on Jones' claim that she was terminated and retaliated against, all in violation of 42 U.S.C. § 1981. The defendant argues that the evidence adduced by the plaintiff does not create a genuine issue of material fact on either claim, thereby entitling it to summary judgment.

**A. Discriminatory Termination Claim**

Jones first argues that she did not actually abandon her job because Product Action's policy only applies to departures from the job site, not work stations. In the alternative, the plaintiff argues that she was fired for following the instructions of her immediate supervisor. Neither of these arguments are compelling because the court does not sit as a "super personnel department" that evaluates whether an employer's decision are mistaken. *See Lee v. GTE Florida*, 226 F.3d 1249, 1254 (11th Cir. 2000) (internal citations omitted). The only question for the court is whether the defendant terminated Jones based on the racially discriminatory application of its job abandonment policy. Simply put, the relevant inquiry is whether similarly-situated white employees were treated differently.

To establish a prima facie case of disparate treatment, a plaintiff must present "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion...." *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 312 (1996) (quoting *Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358 (1977)). To establish a prima facie case of disparate treatment, Jones must demonstrate that (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated

similarly situated employees who are not members of the plaintiff's class more favorably; and (4) she was qualified for the job or job benefit at issue." *Rice-Lamar v. City of Ft. Lauderdale,* 232 F.3d 836, 842-43 (11th Cir. 2000) (*citing Holifield v. Reno,* 115 F.3d 1555, 1561-62 (11th Cir. 1997)).

The defendant challenges the plaintiff's ability to create a genuine issue of material fact on the third prong of the above-referenced analytical paradigm.[12]   However, the court concludes that the plaintiff has presented sufficient evidence that Jessica Whitehead is a similarly-situated comparator, and thus, this evidence creates a genuine issue of material fact on the third prong of the analytical paradigm.[13]

Evidence that similarly-situated employees are disciplined more leniently raises the inference that a workplace rule was discriminatorily applied, and is admissible to support a disparate treatment claim.  *See Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1186 (11th Cir.1984).  To prove that employees are "similarly situated," Jones must show that the comparator employees were "involved in or accused of the same or *similar conduct*" yet were disciplined in a different, more favorable manner. *Anderson v. WBMG-42*, 253 F.3d 561, 564 (11th Cir. 2001) (emphasis added).  Further, the court requires similarity in "quantity and quality of the comparator's misconduct"so that the court does not engage in "second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

---

[12]The court rejects Product Action's argument that Jones was not qualified for her job as a quality inspector because this argument was raised for the first time in its reply brief and discussed in a cursory fashion without reference to supporting authority. *See Reliance Ins. v. Richfield Hospitality Servs.,* 92 F. Supp. 2d 1329, 1332 (N.D. Ga. 2000) (holding that federal courts should not consider arguments raised for the first time in a reply brief).

[13]Based on this determination, the court does not address the issue of whether Kelly Brown is a similarly situated comparator.

As the above-referenced authorities indicate, the inquiry focuses on the nature of the offenses committed and the punishments imposed. *See Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998). The parties do not dispute that Peake had the requisite discretionary authority to discipline employees for violations of company policy. The parties also do not dispute that Whitehead only received a three-day suspension for leaving the job site on June 4, 2002 while Jones was terminated for leaving her work station fifteen minutes early to notify Livermore about the presence of the IPP tags.

Despite these visceral similarities, the defendant argues that Whitehead is not a valid comparator because the plaintiff (1) has no direct knowledge of the circumstances of Whitehead's suspension; (2) assumes that Whitehead left the job site without her supervisor's permission; and (3) mistakenly assumes that Whitehead's suspension was a result of the company's job abandonment policy, instead of its separately-administered attendance policy.[14]

The court rejects the defendant's first two arguments because Jeffrey Peake's deposition provides sufficient evidence from which a jury could reasonably infer the circumstances of Whitehead's suspension. For example, Peake's written reprimand confirms that Whitehead was disciplined for leaving work early on June 4, 2002.[15] Furthermore, and perhaps more importantly, Peake testified that, based on his decision to issue a written reprimand, a reasonable conclusion would be that Whitehead left work early on June 4, 2002 without her supervisor's permission.[16] Evaluating Peake's testimony within the requisite standard of review, the court

---

[14]*See* doc. # 22, p. 14.

[15]*See Id.*, *Ex.* 15.

[16]*See* Dep. of Jeffrey Peake, p. 58.

8

concludes that, for the purposes of summary judgment, the court may reasonably assume that Whitehead left her job site without her supervisor's permission. *See Earley*, 907 F.2d at 1080 (requiring courts to evaluate the evidence and the inferences drawn from that evidence in the light most favorable to the non-movant).

The court also rejects Product Action's last argument, which is premised on a perceived distinction between its attendance and job abandonment policies. Nothing in the record provides the court with a reasoned basis for making such a distinction. For example, the employee handbook does not distinguish between the attendance or job abandonment policy or otherwise indicate that the two policies are mutually exclusive. Ironically, the handbook discusses the job abandonment policy within the larger context of the attendance policy.[17]

More importantly, the plain language of the policy, with its emphasis on "leaving the job site, leaving the work incomplete," encompasses situations like Whitehead's leaving the job site early because of an illness. Again, the plain language of the job abandonment policy does not create an exception based on the employee's *motivation* for leaving the job site and, instead, mandates dismissal for **any** unauthorized departure from the job site. Consequently, a jury could reasonably reject the defendant's distinction between the two policies and interpret Peake's decision to consider extenuating circumstances in Whitehead's case (i.e., her illness and corresponding doctor's excuse) and not to consider the extenuating circumstances in Jones' case (i.e., having to leave her work station fifteen minutes early to notify Livermore of the presence of the IPP tags) as the quintessential example of the differential application of a workplace policy. *See Hairston,* 9 F.3d at 919 (holding that where a reasonable fact finder may "draw more than

---

[17]*See* doc. # 23, *Ex*. 2.

one inference from the facts, then the court should refuse to grant summary judgment."). Consequently, the court concludes that Whitehead and Jones are similarly situated for purposes of establishing a prima facie case of disparate discipline.

The court also concludes that the plaintiff has presented sufficient evidence of pretext to survive a motion for summary judgment. After a defendant provides the court with a race-neutral justification for the adverse employment action, the plaintiff must show that the defendant's explanation is not worthy of credence to survive a motion for summary judgment. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). "Under the established rule of law in this Circuit, a plaintiff can survive a motion for summary judgment or for judgment as a matter of law simply by presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons." *Evans v. McClain of Georgia*, Inc. 131 F.3d 957, 964 -65 (11th Cir. 1997). This showing is typically referred to as the pretext requirement. *Id.*

A plaintiff can demonstrate pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable fact-finder could find them unworthy of credence." *Hamilton v. Montgomery County Bd. of Educ.*, 122 F. Supp. 1273, 1281 (M.D. Ala. 2000) (citing *Combs*, 106 F.3d at 1528). A plaintiff may utilize comparator evidence of the differential application of the workplace rules to establish pretext. *See Walker v. Mortham*, 158 F.3d 1177, 1184 n. 10 (11th Cir. 1998); *Miles v. M.N.C. Corp.*, 750 F.2d 867 (11th Cir. 1985).

In this case and for the reasons outlined in the discussion of the *prima facie* case, the court concludes that the strength of the plaintiff's comparator evidence is sufficient to establish pretext

because it raises questions about the legitimacy of Product Action's justification for the differential discipline.

Based on the above-referenced analysis, the court concludes that the defendant's motion for summary judgment is due to be denied on the plaintiff's disparate discipline claim.

**B. Retaliation Claim**

To establish a *prima facie* case of retaliation, Jones must establish (1) that she engaged in a statutorily protected expression; (2) that she was subjected to an adverse employment action; and (3) that a causal link exists between the adverse employment action and the protected activity. *Hairston*, 9 F.3d at 919. At issue in this case is the causation element of the analytical paradigm. The *Hairston* court explained that this element requires a plaintiff to establish that the protected activity (in this case, complaining about her June 2002 suspension) and the adverse employment action (termination) were not wholly unrelated. *Hairston*, 9 F.3d at 920. The requisite causal connection in a retaliation case can also be inferred from close temporal proximity. *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999). However, *"[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action."* *Hairston*, 9 F.3d at 920 (emphasis added; external citations omitted). *See also, Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).

As evidence of the requisite evidentiary nexus, Jones primarily points to the temporal proximity between her June 2002 suspension and her August 2002 termination. In response to the defendant's argument about the alleged decision makers' lack of awareness, plaintiff urges the court to impute Peake's awareness of her prior complaints of discrimination to the other

11

decision-makers, specifically, Urschel and Houck.

Despite the two month temporal proximity between the plaintiff's suspension and the termination, the court nevertheless concludes that Jones has not adduced sufficient evidence that Peake, the only person with any input in the decision to terminate the plaintiff who was aware of her prior allegations of discrimination, communicated his awareness of her prior complaints of discrimination to Urschel and Houck.[18]  Plaintiff admits that she did not inform Urschel or Houck of her suspicions that she was discriminated against in connection with her June 2002 suspension[19] and cannot provide the court with any evidence that Peake conveyed his awareness of her prior complaints to either Urschel or Houck.

Furthermore, Jones does not argue, and the record does not contain any evidence that Peake manipulated Urschel or Houck into terminating the plaintiff or that Peake was otherwise motivated by a retaliatory animus during his participation the collective decision-making process. *Cf., Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2001) (holding that ultimate question centers on whether the plaintiff can demonstrate that other employees had leverage or influence of the actual decisionmakers).  In short, Jones only evidence of the requisite causal connection is the temporal proximity.  As *Brungart* and *Farley* indicate, temporal proximity alone is insufficient to defeat a properly supported motion for summary judgment.

Although the court must view all evidence in a light most favorable to the plaintiff, it cannot simply endorse the plaintiff's conclusory allegations that are wholly unsupported by

---

[18]Based on this determination, the court does not address the issue of whether Jones' complaint was a statutorily protected expression.

[19]Pl's Dep., p. 78-80.

evidence. *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (11th Cir. 1985). Without evidence of Urschel or Houck's actual knowledge of her prior complaints, evidence that Peake informed Urschel or Houck of the plaintiff's prior complaints, or evidence that Peake was motivated by a retaliatory animus, a reasonable juror simply could not conclude that Jones' termination was retaliatory. Accordingly, the defendant's motion for summary judgment is due to be granted on the plaintiff's retaliation claim.

## IV. CONCLUSION

Based on the foregoing analysis, the court concludes that the defendant's motion for summary judgment (doc. # 21) is due to be GRANTED in part and DENIED in part.

A separate order will be entered.

DONE and ORDERED this the 23rd day of February, 2005.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

13